RECEIVED
IN LAKE CHARLES, LA

JUL 14 2011
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| DARILYN S. CHESTER | : | DOCKET NO. 2:10 CV412 |
| VS. | : | JUDGE MINALDI |
| VINSON GUARD SERVICE, INC. | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment, filed by the defendant, Vinson Guard Services ("VGS") [Doc. 28]. The plaintiff, Darilyn Chester, filed an Opposition. [Doc. 46]. VGS filed a Reply [Doc. 50], and Ms. Chester filed a Sur-reply [Doc. 53].

## BACKGROUND

In this lawsuit, Ms. Chester claims that VGS unlawfully discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* She also asserts a Louisiana state law claim for Intentional Infliction of Emotional Distress. This lawsuit was originally brought against both VGS and Westlake Petrochemicals LLC ("Westlake"). [R. Doc. 1]. Recently, however, the parties voluntarily dismissed Westlake from this lawsuit. [R. Doc. 49].

VGS provides security guard services in the Lake Charles region. In 2008, VGS hired Ms. Chester as a guard. At the outset of her employment, VGS provided Ms. Chester with a copy of its employee handbook. The handbook contained a prohibition on harassment and discrimination, and included a harassment reporting procedure. It exhorted employees immediately to report any incidents of harassment to VGS's Compliance Coordinator. If the employee was unable to obtain prompt action from the Compliance Coordinator, they were

1

instructed to contact J.D. Vinson, Jr., VGS's president. "[T]o ensure no unlawful activity occurs in the workplace," it encouraged employees to report any objectionable conduct, even if employees are unsure whether that conduct is a violation of the policy. [R. Doc. 28-3 ¶¶ 1-2, 24-27; R. Doc. 46-3].

After assigning Ms. Chester to various posts in the Lake Charles region, VGS eventually transferred her to a guard position at Westlake's petroleum facility. This was a coveted post because under the contract between Westlake and VGS, additional employment benefits were available to guards who worked at one of Westlake's facilities. For instance, full time VGS employees who worked at a facility for one year or more were eligible for medical benefits and paid vacation. [R. Doc. 28-3 ¶¶ 7-9; R. Doc. 46-3 ¶¶ 8-9].

At Westlake's facilities, VGS employees were assigned various work shifts. Many guards worked what employees describe as a "Canadian Shift" – 12-hour shifts with alternating start times of either 4 a.m. or 4 p.m. for three or four days during the workweek. Non-Canadian Shift guards, commonly referred to as "floaters," may be assigned specific regular day or night shifts through the whole workweek. But, their schedule potentially varied; they might be required to fill in at other posts when needed. [R. Doc. 28-3 ¶¶ 3, 5; R. Doc. 46-3 ¶ 5].

Ms. Chester, who was a full-time "floater," generally worked an eight hour shift Monday through Friday at Westlake's Petroleum facility. Although she typically worked with VGS employee, DJ Virgadamo, scheduling changes often required her to work with other employees, including Elton Rougeau. Ms. Chester claims that Mr. Rougeau was a VGS supervisory employee, but only for the limited purpose of filling in when her normal supervisor, Captain Charles Alfred, was away. [R. Doc. 28-3 ¶¶ 10-13; R. Doc. 46-3 ¶ 13].

2

The crux of Ms. Chester's lawsuit is that during the five months she worked at the Westlake facility, from July of 2008 to January of 2009, Mr. Rougeau sexually harassed her. Cryptically, she claims that he first sexually harassed her while they worked together as co-workers. Next, she claims that during an approximately three week interval while Captain Alfred was away on vacation, Mr. Rougeau sexually harassed her during the time he assumed Captain Alfred's role as supervisor. [R. Doc. 1; R. Doc. 28-3 ¶ 23; R. Doc. 46-3].

Ms. Chester did not initially report any of Mr. Rougeau's alleged harassment to VGS. However, a co-worker, Tina Savoy, did. In the first week of January, 2009, Ms. Savoy informed Captain Alfred that Mr. Rougeau viewed an inappropriate website at work. Captain Alfred provided Mr. Rougeau with a written warning and directed him to use the internet at work only for e-mail communications. [R. Doc. 28-3 ¶¶ 16-20; R. Doc. 46-3 ¶ 20].

Meanwhile (i.e., during the first week of January, 2009), VGS transferred Ms. Chester from a post at Westlake's Petrochemical facility to a post at Westlake's Polymer facility. At this post, Ms. Chester contends that a co-worker, Donald Brooks, harassed her. She does not claim that he sexually harassed her. Instead, she asserts that he engaged in a pattern of extreme and outrageous behavior by (1) calling her a "petro reject" and a "hillbilly in a Cadillac," (2) singing derogatory songs around her while marching around and saluting her in a mocking manner, and (3) indicating that he was watching her closely so he could report any misconduct to Captain Alfred and have her fired. [R. Doc. 28-3 ¶¶ 34-37; R. Doc. 46-3 ¶¶ 35, 37].

On January 14, 2009, after VGS transferred her to the Polymer facility, Ms. Chester reported Mr. Rougeau's alleged harassment. Rather than follow company protocol and complain to VGS directly, she reported it to Westlake's Human Resource Manager, Kerrie Courville. The next day, Ms. Courville met with Ms. Chester and Lelan Laborde, VGS's Regional Manager. Mr.

Laborde investigated the allegations after the meeting. Collectively with VGS's home office, Mr. Laborde transferred Mr. Rougeau from Westlake's facility and cut his pay. According to the undisputed facts of both parties, this completely ended the alleged harassment. [R. Doc. 28-3 ¶¶ 23, 28-33; R. Doc. 46-3 ¶ 29].

Just days after reporting the harassment, Ms. Chester called Christine Vinson, VGS's Quality Control Manager, to inform her that she was having problems on the job. After Ms. Chester put her complaint in writing, Ms. Vinson and J.D. Vinson called Ms. Chester to discuss her problems and offer potential solutions, to no avail. On January 28, 2009, Ms. Chester quit her job. She now contends that VGS constructively discharged her. [R. Doc. 28-3 ¶¶ 38-40, 46; R. Doc. 46-3 ¶¶ 40, 46].

At the same time, Ms. Chester also complains that she was passed over for Canadian-shift positions while she worked at VGS because she is white. Specifically, she asserts that VGS discriminated against her when it refused to put her on a four-to-four Canadian-shift, and instead chose three black men – Reggie McClutchen, Freddy Picou, and Albert Richard – and one black woman – Sarah – for those shifts. [R. Doc. 1; R. Doc. 28-3 ¶¶ 47, 50; R. Doc. 46-3 ¶¶ 47, 50]. Now, VGS seeks summary judgment on all of Ms. Chester's claims.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial.

4

*Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). If the dispositive issue is one that the nonmoving party bears the burden of proof at trial, the moving party may satisfy its burden by merely identifying evidence in the record that negates an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.*

If the movant satisfies this burden, however, then the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Tubacex*, 45 F.3d at 954. In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, summary judgment is warranted when the record as a whole "could not lead a rational finder of fact to find for the non-moving party." *Id.*

## LAW & ANALYSIS

### (1) Ms. Chester's Title VII Claims

#### a. Hostile Work Environment

Ms. Chester initially claims that VGS violated Title VII by subjecting her to a sexually hostile work environment. To set-forth a *prima facie* case of sexual discrimination alleging hostile work environment, the plaintiff must establish five elements: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcomed sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of was so severe or pervasive that it affected the terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action (i.e., vicarious liability). *Jones v. Flagship Intern.*, 793 F.2d 714, 719-20 (5th Cir. 1986); *Celestine v. Petroleos de Venezuella, SA*, 266 F.3d 343, 353 (5th Cir. 2001) (citing

5

*Watts v. Kroger Co.*, 170 F.3d 505, 509-10 (5th Cir. 1999)). At issue are the final two elements of her *prima facie* case.

To determine whether an employer is vicariously liable for a hostile work environment, courts first consider whether the person who allegedly created that environment is properly characterized as having been the plaintiff's "supervisor" or "co-worker." Generally, an employer is strictly and vicariously liable for a hostile work environment created by "a supervisor with immediate (or successive higher) authority over the [the plaintiff.]" *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *see Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). But, an employer is only liable for a hostile work environment created by a co-worker if the employer was negligent in discovering or remedying the harassment. *See id.*

Although the parties dispute whether Mr. Rougeau is properly characterized as a supervisor when he assumed Captain Alfred's role while Captain Alfred was away on vacation, this Court will assume for purposes of this motion that Mr. Rougeau acted as a supervisor during this time. This assumption is not controlling, however. The major problem with Ms. Chester's claim is that it is premised on approximately five months of harassment. During this time, Mr. Rougeau acted as her supervisor for, at most, three weeks. And, this three week period occurred near the end of Ms. Chester's tenure at VGS.

While strict liability attaches to Mr. Rougeau's actions while he acted as Ms. Chester's supervisor, it is wholly inappropriate to hold VGS strictly liable for Mr. Rougeau's conduct while he acted as Ms. Chester's co-worker. *See Ellerth*, 524 U.S. at 763. As the Supreme Court explained, a co-worker can inflict physical or psychological harm just as easily as a supervisor, but a co-worker cannot take tangible employment action against a fellow co-worker. *Id.* Ultimately, it is the misuse of supervisory authority (directly, through tangible employment

actions, or indirectly, through the misuse of authority to create/facilitate harassment) that renders the employer strictly liable under Title VII for a supervisor's conduct. *Id.* at 763.

However, the justifications for imposing strict liability are not present for harassment that occurs before the alleged harasser can be characterized as a supervisor, even when that alleged harasser is eventually promoted to a supervisory role. *See id.* This is especially true in this case since Mr. Rougeau's supervisory authority was merely transient and temporary. Once Captain Alfred returned from vacation, Mr. Rougeau could no longer "bring the official power of the enterprise to bear on a subordinate." *Id.* Thus, VGS may only be held strictly liable for the alleged harassment that occurred while Mr. Rougeau assumed Captain Alfred's position. For conduct that occurred while Mr. Rougeau was Ms. Chester's co-worker, the negligence standard applies. Under this bifurcated approach, Ms. Chester's hostile work environment claim fails for two reasons.

First, Ms. Chester has not satisfied the final element of her *prima facie* case of co-worker harassment because there is no evidence from which a jury could infer that VGS had actual or constructive knowledge of Mr. Rougeau's alleged conduct.

An employer may be subject to Title VII liability only when it has actual or constructive knowledge of the harassment and fails to take remedial action to stop it. *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999). An employer has *actual* knowledge of harassment "that is known to 'higher management' or to someone who has the power to take action to remedy the problem. *Id.* For an employee to qualify as someone with sufficient remedial power to impute actual knowledge to an employer, the employee must generally possess the power to either "fire the offending employee" or take some other direct action to prevent the harassment. *Id.*

7

An employer has *constructive* knowledge of harassment if, through the exercise of reasonable care, it or one of its employees with sufficient remedial authority to end the harassment should have known of the harassment. *Id.* "If the harassment complained of is so open and pervasive that the employer should have known of it, had it but opened its corporate eyes, it is unreasonable not to have done so, and there is constructive notice." *Id.* at 930; *see also Watts v. Kroger Co.*, 147 F.3d 460, 463-65 (5th Cir. 1998) (noting that all public comments were sex-neutral, while private comments were sexual). Further, the existence and effectiveness of an anti-harassment policy may be relevant in determining whether the employer had constructive knowledge of a hostile work environment, but it is not alone sufficient. *Id.*

Here, there is no evidence that VGS had actual knowledge of the alleged harassment until Ms. Chester reported it to Westlake's Human Resource Manager, Ms. Courville. There is no evidence that any VGS supervisory employees or management had any notice that Mr. Rougeau harassed Ms. Chester prior to her complaint.

Moreover, there is no evidence that VGS had constructive knowledge of the harassment. There is no evidence to indicate that Mr. Rougeaus' actions were sufficiently open to impute constructive knowledge on VGS. *See Colbert v. Georgia-Pacific Corp.*, 995 F. Supp. 697, 702 (N.D. Tex. 1998) (holding that evidence that the employer knew of complaints by one of the plaintiff's coworkers against the plaintiff's alleged harasser was insufficient to establish that the company had constructive notice that the plaintiff was harassed). Rather, his actions were discrete incidents of harassment that were physically and temporally isolated from those with power to remediate. *See Sharp*, 164 F.3d at 930; [Doc. 47-1, Pl.'s Ex. B, Dep. of Charles Alfred, 17-18; Doc. 47-6, Pl.'s Ex. G., Dep. of Artinna Monique Savoy Brooks, 14; Doc. 47-5, Pl.'s Ex. F, Dep. of Donald Jonathan Virgadomo, 41-42 (noting that three individuals heard Mr. Rougeau

discussing sexual topics at work and indicating that Captain Alfred overhead such discussion "[p]robably" more than once.")].

In addition, no evidence indicates that VGS's supervisory employees lacked sufficient control over Mr. Rougeau to render its supervision negligent. *See Jackson v. Federal Exp. Corp*, 3:03-CV-2341-D, 2006 WL 680471, at *11 (N.D. Tex. Mar. 14, 2006) ("[M]anagement lacked control over drivers, who consequently became increasingly profane."). Likewise, there is no evidence that VGS isolated its employees from management, such that it turned a "blind-eye" to any potential co-worker harassment. *See Sharp*, 164 F.3d at 930 (finding the defendant had constructive notice when the office atmosphere led supervisors to turn a blind eye to potential harassment). No evidence further supports the inference that VGS displayed sufficient loyalty to Mr. Rougeau that it should have known of the possibility of harassment through its failure to take any preventive action.

Most compellingly, Ms. Chester had a viable means of reporting or addressing the harassment she allegedly endured. *See id.* She, for example, could have easily followed company protocol and reported Mr. Rougeau's conduct to VGS's New Orleans office, as instructed by the employment manual. She could have likewise reported the alleged harassment to either Mr. LaBorde at VGS's regional office or Captain Alfred, her immediate supervisor. Aside from an unsubstantiated personal fear of reporting harassment, nothing stood in the way of her pursuing these options. *See id.* Thus, there is no evidence that VGS had actual or constructive knowledge of the harassment until Ms. Chester reported it in January of 2009.

Moreover, when a company once informed of allegations of harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability. *See Jones v. Flagship Int'l*, 793 F.2d 714, 719 (5th Cir. 1986). Prompt remedial action need not actually end

9

the harassment; rather, it must be *"reasonably calculated* to end the harassment." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004) (citations omitted) (emphasis added); *see Skidmore v Precision Printing & Packaging*, 188 F.3d 606, 616 (5th Cir. 1999) (finding that the employer took "prompt remedial action" when a manager reprimanded the harassing co-worker by moving him to a different shift and instructing him to leave the plaintiff alone). Here, VGS's remedial action, by Ms. Chester's own admission, ended the harassment. [R. Doc. 28-3 ¶ 33; R. Doc. 46-3]. Thus, the plaintiff has failed to establish the fifth element of her *prima facie* case with respect to Mr. Rougeau's co-worker harassment.

Second, Ms. Chester has failed to satisfy the fourth element of her *prima facie* case of supervisor harassment because there is no genuine issue of material fact concerning whether Mr. Rougeau's conduct was sufficiently severe or pervasive to alter the terms or conditions of Ms. Chester's employment and create an abusive working environment.

The focal point of the fourth element is the alleged conduct, measured under both an objective and subjective standard. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993) (internal citations omitted). To satisfy this element, the victim must have perceived the environment to be abusive, and the harassment must have been such that a reasonable person would consider it severe under the totality of the circumstances. *Id.*

In this case, the parties implicate the latter issue; that is, whether Mr. Rougeau's conduct was objectively severe. [R. Doc. 28-1 at 9-10]. This inquiry requires an *ad hoc* analysis, "focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Amie v. City of Jennings, La.*, 2005 WL 1788068, at *1 (W.D. La. 2005) (citing *Green v. Administrators of*

*Tulane Educational Fund*, 284 F.3d 642, 655 (5th Cir 2002)). Simple teasing, offhand comments and isolated incidents (unless extremely serious) rarely will be enough to sustain a hostile work environment claim. *Faragher*, 524 U.S. at 778.

For instance, in *Shepherd v. Comptroller of Public Accounts of State of Texas*, 168 F.3d 871, 872 (5th Cir. 1999), the plaintiff alleged that over the course of almost two years, her co-worker subjected her to a series of offensive comments and actions, including (1) standing over her desk and stating, "your elbows are the same color as your nipples"; (2) remarking "you have big thighs" while pretending to look under her dress; (3) attempting to look down her clothing as he stood over her desk; (4) rubbing her arm from her shoulder to her wrist; and (5) patting his lap and saying "here's your seat." While the Fifth Circuit described the conduct as "boorish and offensive," it was not sufficient to be "severe or pervasive." *Id.* at 874. Despite lasting nearly two years, the court reasoned that each statement was "the equivalent of a mere utterance of an epithet that engendered offensive feelings." *Id.* The court further highlighted that none of the comments or actions were physically threatening, and none interfered with the plaintiff's workplace competence. *Id.*

Here, Ms. Chester complains of two instances of alleged harassment by Mr. Rougeau while he acted as her supervisor. First, on December 23, 2008, Ms. Chester overheard Mr. Rougeau discussing some of his sexual experiences. Next, on December 27, 2008, while she was working with Mr. Rougeau, he discussed the size and shape of women's "asses" as these women headed into work at Westlake's facility. During this discussion, he also mentioned whether, in his opinion, each woman had either gained or lost weight, and indicated "how he screwed every size ass." Ms. Chester alleges no other instances of harassment during this time. [R. Doc. 48-3,

11

Pl.'s Ex. L, Email from Ms. Chester to Ms. Vinson; R. Doc. 28-2, Def.'s Ex. 12, Email from Ms. Chester to Ms. Vinson, attached to Ex. 8, Dep. of Christine Maria Vinson].

These actions are insufficient, as a matter of law, to constitute a Title VII violation. The allegations here lack the frequency or severity of the harassment in *Shephard*, which the court found insufficient to raise a material issue of fact over the plaintiff's hostile work environment claim. 168 F.3d at 872. Moreover, as the court highlighted in *Shephard*, none of Mr. Rougeau's comments were physically threatening, and each of his comments was merely an isolated offensive epithet. *Id.* at 872, 874. In sum, Ms. Chester's allegations are insufficient to meet the Title VII requirement that the alleged discrimination created a hostile work environment. Accordingly, summary judgment in favor of VGS is warranted on Ms. Chester's hostile work environment claim.

### b. Constructive Discharge through a Hostile Work Environment

Next, Ms. Chester asserts that the hostile work environment affected the terms and conditions of her employment and ultimately led to her constructive discharge. Specifically, Ms. Chester claims that "she was allegedly harassed and badgered and that her assignment to [Westlake's Polymer facility] to work with Donald Brooks was done in order to encourage her to resign." [R. Doc. 46, Pl.'s Mem. in Opp'n to Summ. J. at 19].

However, this claim automatically fails. Not only must a plaintiff establish a *prima facie* case of a hostile work environment, a "[c]onstructive discharge [claim also] requires a greater degree of harassment than that required by a hostile environment claim." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001); *see Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004); *see also Aryain v. Wal-Mart Stores Tx. LP*, 534 F.3d 473, 480 (5th Cir. 2008) ("A plaintiff alleging that sexual harassment alone compelled him to resign must present 'something

more' than what is required to establish a harassment or hostile work environment claim."). Thus, because VGS is entitled to summary judgment on Ms. Chester's hostile work environment claim, it follows that VGS is entitled to summary judgment on Ms. Chester's claim of constructive discharge through a hostile work environment. *See id.*

### c. Retaliation Through Constructive Discharge

Ms. Chester further claims that she was constructively discharged in retaliation for her complaints of sexual harassment. She apparently contends that VGS transferred her to Westlake's Polymer facility, where she was subject to Mr. Brooks' allegedly outrageous conduct, in retaliation for (1) raising her complaint about Mr. Rougeau's harassment to Ms. Courville and Mr. Laborde or (2) agreeing to participate in Ms. Savoy's earlier sexual harassment complaint. [R. Doc. 46, Pl.'s Mem. in Opp'n to Summ. J. at 22-23; R. Doc. 53-2, Pl's Sur-reply at 3-4.]

Title VII's anti-retaliation provision prohibits an employer from *retaliating* against an employee who has opposed an employer's discriminatory activity or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case of retaliation, the plaintiff must, in relevant part, establish a causal connection between the protected activity and the adverse employment action, which Ms. Chester cannot do. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312-13 (5th Cir. 2004).

Here, the undisputed facts indicate that Ms. Chester was transferred to the Polymer facility prior to raising her discrimination complaint. *See* L.R. 56.1-56.2W ("All material facts set forth in the statement. . . are admitted, for purposes of the motion, unless controverted."). Thus, the alleged retaliation occurred before Ms. Chester engaged in Title VII protected activity. While she further claims that she *might* have been asked to testify in Ms. Savoy's sexual

13

harassment complaint, which allegedly may have precipitated her transfer, there is absolutely no admissible evidence to support this contention, only mere speculation.

At its most basic level, a retaliation claim is premised on some protected activity that motivates retaliation. *See, e.g., Allen v. Chicago Transit Authority*, 317 F.3d 696, 700 (7th Cir. 2003) ("It is the motive for, rather than the character of, the actions taken against the employee that determines whether the claim is one of retaliation") (Posner, J.). Without some motive to retaliate, an employer cannot be held liable for retaliation. *Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874, 883 n. 6 (5th Cir. 2003) ("Although the plaintiff's burden at the prima facie stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of his protected activity."). Because there is no dispute that her transfer occurred *before* Ms. Chester engaged in protected activity, there is no causal connection between her protected activity and transfer. *See id.* Thus, Ms. Chester has not established the final element of her *prima facie* case, and VGS is entitled to summary judgment.

### d. Racial Discrimination

Next, Ms. Chester claims that VGS discriminated against her based on her race when it refused to place her on a Canadian-shift while it placed three black men and one black woman on those shifts during her time at VGS. [R. Doc. 46, Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 6-8]. To establish a *prima facie* case of reverse discrimination, the plaintiff must prove: (1) that she belongs to a class; (2) that she was qualified for and applied for a promotion; (3) that she was rejected despite her qualifications; and (4) that other employees with equal or lesser qualifications who were members of a protected minority were promoted. *See Wilson v. Bailey*, 934 F.2d 301, 304 (11th Cir. 1991); *Young v. City of Houston, Texas*, 906 F.2d 177, 180 (5th Cir.

1990). VGS argues that Ms. Chester cannot and has not met her *prima facie* case regarding the second, third, and fourth elements.

To satisfy the second and third element, Ms. Chester must at a minimum establish that she was qualified for, sought, and was denied a "promotion." *See Young*, 906 F.3d at 180. The parties do not dispute that a change from a "floater" to a Canadian-shift position is at most considered a lateral transfer, not a promotion. Indeed, a Canadian-shift is exactly what its name implies, a shift, not a particular position at VGS. [R. Doc. 28-3 ¶ 3; R. Doc. 26-3].

"Standing alone, the denial of a transfer cannot constitute an adverse employment action. . . ." *Lewallen v. City of Beaumont*, 394 Fed. Appx. 38, 43 (5th Cir. 2010). In some cases, however, the denial of a transfer "*may* be the objective equivalent of the denial of a promotion" if the position sought is "objectively better." *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007).

Ms. Chester solely contends that the Canadian-shift is objectively better because it provides, or is at least more likely to provide, secure hours and better benefits. This Court disagrees. The contract between Westlake and VGS provides that "full-time" VGS employees are eligible for benefits. It does not distinguish between employees who work full-time "floater" shifts and employees who work full-time Canadian-shifts. [R. Doc. 28-2, Def.'s Ex. 6, Contract between Westlake and VGS, Schedule "C", attached to Ex. 5, Dep. of Lelan Laborde]; *see also Doré Energy Corp v. Prospective Inv. & Trading Co.*, 570 F.3d 219 (5th Cir. 2009) (holding that the interpretation of an unambiguous contract is a legal issue for the court). Moreover, VGS makes clear to its employees that "no guard owns a post." Guards, therefore, have no expectation that a certain shift translates into a certain job. Guards may be transferred to or from

a Canadian-shift to a "floater" shift at will without the implication that it is a tangible employment action. [R. Doc. 28-3 ¶ 36; R. Doc. 46-3].

Nor is it relevant that a transfer to a Canadian-shift is *more likely* to result in employment benefits. *Burger v. Central Apartment Mngmt., Inc.*, 168 F.3d 875, 880 (5th Cir. 1999). Title VII only prohibits an adverse employment action, not an "interlocutory or mediate" action that *may* result in an adverse employment action, such as a transfer to a different shift. *Id.* ("Transferring an employee to a less secure (but otherwise similar) position is obviously an 'interlocutory or mediate decision. . . .'") (internal citations omitted). It is true that many VGS guards may desire Canadian-shifts, believing the hours to be more reliable and thus more likely to lead to tangible employment benefits. However, the mere isolated *possibility* that a guard in a full-time "floater" position is less likely than a full-time Canadian-shift guard to qualify for benefits is insufficient, as a matter of law, to raise a factual issue for trial. *See id.* Accordingly, VGS is entitled to summary judgment on Ms. Chester's discrimination complaint.

## (2) Intentional Infliction of Emotional Distress

Finally, Ms. Chester claims that VGS, through Mr. Brooks' actions, is liable for the Louisiana tort of Intentional Infliction of Emotional Distress ("IIED"). To establish an IIED claim, Ms. Chester must prove that (1) VGS's conduct was extreme and outrageous; (2) she suffered severe emotional distress; and (3) VGS desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from its conduct. *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991). To satisfy the first element,

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of

>rough language, and to occasional acts that are definitely inconsiderate and unkind.

*Id.* In the workplace setting, the Louisiana Supreme court has "limited the cause of action to cases which involve a pattern of deliberate, repeated harassment over a period of time." *Nicholas v. Allstate Ins. Co.*, 765 So.2d 1017, 1026-27 (La. 2000).

Here, Ms. Chester merely complains of mocking and insulting behavior that occurred, at most, over a three-week period. This is insufficient to render the conduct "extreme and outrageous." It merely amounts to insults and other petty oppressions that occurred over a brief period of time, which is insufficient as a matter of law to impose liability for IIED. *See, e.g., Stewart v. Parish of Jefferson*, 95-407 (La.App. 5 Cir. 1/30/96), 668 So.2d 1292, *writ denied*, 96-0526 (La.4/8/96), 671 So.2d 340 (holding that intentional infliction of emotional distress was not shown, even though a supervisor maintained two-years of harassment in which he questioned the worker's personal life, increased the workload, and pressured the employee to accept a demotion that ultimately led to the employee's termination).

## CONCLUSION

Because the evidence does not demonstrate that there is a material issue of fact concerning any of Ms. Chester's claims, it is

ORDERED that the defendant's Motion for Summary Judgment is hereby GRANTED;

IT IS FURTHER ORDERED that the plaintiff's lawsuit is DISMISSED with prejudice, and all pending motions are hereby DISMISSED as moot.

Lake Charles, Louisiana, this 13 day of July 2011.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE